The next and last case for argument is Schutte Bagclosures v. Kwiklop. I'm sorry? Yes. And we'll take a moment while you set up the easel. Is there a place I should put it? Here? Probably, yeah, so long as it's a little bit to the side and sort of a little more towards Judge Walker would be, I think, helpful. Slide it that way and... You can move it. I tell you what, why don't you move those chairs out of the way? Just move those two chairs out of the way, or one of them anyway. Mr. Reiner, can you see that okay, or adequately for your purposes? Could you back it up just a little bit? Do you care? Just back it up a little bit. Okay. Okay, yeah, that's good. All right. Mr. McQuillan, good morning. May it please the Court. The founder of Kwiklop Corporation, Floyd Paxton, invented the first all-plastic bag closure in the 1950s. From the 50s to this day, Kwiklop has been located in the Yakima Valley in Washington State. He was inspired to come up with a flat tab made of a strong but flexible plastic, high-impact polystyrene. Due to the need to close the vinyl bags used to package Washington apples, the Yakima Valley is so well known for. To this day, Kwiklop closures are made of this high-impact polystyrene plastic, and along with a slot opening and hole in the middle of a plastic tab, form the core functional features of a plastic bag closure. Of course, these features are free for anybody to use. In the early 1960s, Kwiklop expanded its product line from the first-hand applied closures of the 50s to include closures that can work in automated bag closure machines. Thus, the concept of closures in strips that can be fed into a lock track on an automated machine of an assembly line was born, along with the most common form of a Kwiklop, the closure that is featured in Kwiklop's logo, its letterhead, and all its packaging and marketing materials. This is the shape that Kwiklop sought and obtained trademark protection, and that's the 043 registration shown at the bottom of the poster board. And in 1996, after much back and forth about whether Kwiklop was seeking to protect the functional features inherent in plastic bag closures, the PTO issued the 043 registration. As explained to the PTO and acknowledged by the district court, the incontestable 043 registration trade dress includes the features of a square to slightly rectangular three-dimensional configuration of the perimeter of the closure, beveled portions at each corner, and a triangular slot opening at the center of one side. Kwiklop maintains that these features are not functional under the law. The PTO agreed. The district court did not. It is important to note that the slot opening in the hole in the middle comes in a variety of sizes to accommodate bags of various weights and sizes and is not part of the trade dress that was explicitly disclaimed. While the JNRP closure is currently the best seller, the JNRP closure shown at the top here is currently the best seller of Kwiklop closures and is covered by the 043 registration, as the district court recognized. Kwiklop does make a variety of closures for automated bag closure machines of different thicknesses, heights, and widths for the many different sizes and weights of bags that Kwiklop closures are used with, whether it be for the produce or the bakery industry. Many of Kwiklop's closures are not protected by the 043 registration but work in the same automated machines, including the 872 machine discussed in the briefing. To work with different size closures, one only need to swap out the lock track that feeds the strips of closures through the machine. While Kwiklop presented ample evidence of alternative closures that would work in the same lock track as the JNRP, it is important to note that the framework for alternatively shaped plastic bag closures that can work in Kwiklop's machines is actually much broader than the shape protected by the 043 registration, and many of these closures are on the market today. What's your strongest argument that the district court got this wrong? The starting point is that the district court made a fundamental mistake in determining that the findings of the patent and trademark office in granting the 043 registration was entitled to little weight, when in fact the registration... It's certainly not binding. Certainly not binding, but it is at least entitled to a presumption of validity and not little weight. What difference would that have made? Your argument is we don't know, so it needs to go back so we can say give it a little more weight and then... Well, we believe it should be given at least a presumption of validity, and the starting point for the court's analysis... Where have we said that, that it gets a presumption of validity? Well, that is statutorily provided for registration before the trademark office, particularly in this case an incontestable registration, while functionality is still available. You've agreed it's an incontestable registration, right? Yes. And I would further point out the court erred in excluding the foul wrapper and all the arguments that Quick Lock presented to the patent office that were accepted by the patent office and eventually granting the 043 registration. The functionality issue was fully vetted before the patent and trademark office. The patents that the district court relied on were before the trademark office and were considered in determining that the 043 registration should issue. These patents date back to the 50s and 60s. Clearly, if there's a competing bag closure that is functional, that can only function through this machine, then how can there be protection? If this essentially is a functional item, and granted it does have this registration, but the judge found after a comprehensive trial that this was essentially a functional item and a competitor would have equal functionality, right? Therefore, it couldn't be protected. I still don't quite understand how you can get around the judge's findings apart from quibbling about how much weight he gave to the registration. Well, to Your Honor's point, the plastic bag closure covered by the 043 registration serves a functional purpose. It closes bags. Right. Now, with that said, the bag closure and court- Doesn't a competing product have to have basically the same configuration to work into the machine? In fact, as demonstrated on the poster board, just two examples of alternative closures were designed for purposes of this case and shown to work in the machines. These alternative designs don't look anything like the closure that's protected by the 043 registration and is ample evidence that, in fact, you can come up with designs that don't look like Kwik-Lox closures. Do I have to show a likelihood of confusion? Yes, you certainly do. And there were findings against you on that score. That is true, Your Honor, but we believe also those findings were aired that the court- Well, they're packaged differently. Sophisticated buyers here. This is not something that's just sold on the street. It's not a knockoff that's sold on the street. These are sophisticated customers. They can either buy your product or buy the other side's product, not because they're confused, but because they believe the product is better. Well, first of all, as to the packaging, by the time a customer sees the packaging, they've already purchased the product. The customer we're talking about is the customer who buys them to use them to put them on the package. On the package. Correct. We're talking about the packaging of the locks are different when they're sold to the sophisticated customers who know who the source is. I don't think there's any question here about confusion as to source. Were you able to produce any witnesses that said, you know, I wanted to buy Kwik-Lox, but I ended up with this product because I was confused? Well, in this case, Chute had not yet entered the market, so there would not be that evidence. The point to be made about the confusion relates not to the packaging. Once they bought it, the packaging says who the source is. But as an example, I believe it's at A550, is a flyer that Chute prepared that made it clear that their closure works with Kwik-Lox machines. So a customer could be confused as to whether that somehow Kwik-Lox approved those closures or they were authorized closures that could be sold that work in Kwik-Lox machines. It did not appear that Chute intended to make any effort to disabuse a potential customer of that notion. And that harms the reputation of Kwik-Lox, if there are other closures on the market that it does not approve of or come from. Before you sit down, because your red light's on, just explain what these various pictures are. Could you just slide it back just a little bit, Mr. McQuillan, so I can see? There we go. Thank you. So in the bottom here, this is the closure shown in the registration. There was a variety of specimens that were submitted to support that, including ones with webbing on the sides because they came in strict form. This is a closure that came along later that is currently the bestseller, and the district court found that that is covered by the half of the site. Are these all Kwik-Lox closures? No, just this one. Just that one? That is currently sold. This is Chute's closure that we maintain is substantially similar and would confuse the consumer. Right. These two were closures that were designed by a design engineer and were actually made and tested in the machines . . . By Kwik-Lox. . . . by the expert in connection with this case to show that they would run in the machines. Are we in agreement, you and I and Judge Walker and Judge Radjic, that the customer that we're talking about is the orchard, the bakery? Yes. Okay. All right. I'd reserve the remaining . . . Yes. You have three minutes for rebuttal, Mr. McClellan. Mr. Reiner? Good morning, Your Honor. Good morning, Your Honor. Before I begin my misplaced prepared remarks . . . Oh, my goodness. You may have to wing it. I may. The worst things are happening. I could have done it. Actually, before I begin that anyway, I just want to address two things Mr. McClellan said. He addressed a flyer. I'm not sure exactly which flyer. I tried to find it he's referring to. But it mentioned that he believed that there would be potentially a likelihood of confusion through an association of my client, who does make replacement closures for Kwik-Lok products by saying exactly that, that they make closures for Kwik-Lok products, for this machine right here, and that he thought there would be harm there or potentially that would be confusion. And then he said that it harms Kwik-Lok if there are closures on the market that it does not approve of. I mean, that really gets at the core of what we're talking about here. I mean, my client should be allowed to and now is. They didn't before the decision, but now they are, sell replacement closures for these machines that are the standard in the industry. I mean, it goes to show also these products are many years old, and up until my client, there had been no meaningful competition for people selling closures that were replacements for these machines. Now, we don't believe the standard is that it has to have an effect on competition or that these features need to be essential. The standard is very clearly set forth by the Supreme Court, well, it was restated by the Supreme Court in traffics. And that has, whether it has, let me get it right rather than do it by memory. Essential to the use or purpose of the device? Right. It affects the cost or quality of the bag, or excuse me, of the bag closure. Whether it affects the cost and quality. And we believe, as Judge Walker, you mentioned, that after a long and comprehensive trial, the trial court's decision on that was accurate and certainly well substantiated in its role as a fact finder. But in any event, the very fact that something could be on so long, and that billions of them have been sold, in all fairness, I don't want to overstate the market, they cost much less than a cent, that billions of them have been sold with no one else selling closures. I mean, I think that goes to show the utility of this product shape. So let me just turn you back to traffics for a minute. Yes. There are three things that the court said we consider when we're determining whether it's functional, which then takes it out of being protected, right? Yes, sir. Help me understand what I've listed as the third one. The particular product configuration is a competitive necessity. What does that mean? That's in traffics, Your Honor. My understanding was that traffics said that it need not be a competitive necessity. Page 32 and 33 of the traffics opinion. I don't have my copy. Sorry. Forgive me. If you can't, that's fine. I'm just looking for guidance from people who do this on a regular basis. No, of course. And that's why I wish I had the opinion. I'm sorry, Your Honor. But my reading of traffics, and, of course, we've read it very extensively in connection with this case, and, of course, the progeny of it, including the Christian Louboutin case, is that the two elements originally set forth in Inwood are whether it's essential to the performance or whether it affects the cost or quality. And traffics said it need not be a competitive necessity. And forgive me. Obviously, it's right in front of you. Where it needs to be a competitive necessity is with respect to aesthetic functionality. That was my understanding of it. And, again, I apologize if I have it wrong. Because aesthetic functionality has a different standard, and that was, as you can see, in the Christian Louboutin case with respect to the color of the souls. And as far as the – well, I won't answer questions that you didn't ask, Your Honor. Okay. Let me go back to where we were. As you said, like I said before, Judge Walker, the district court held a bench trial over the span of five days and reviewed a great deal of testimony and physical and video evidence and was able to make credibility determinations that it was his role to make as a fact finder. And, in addition, not just the testimony, the district court was able to observe and handle the bag closures, not just the large versions, but also the small ones made out of the HIPS plastic that are at issue in this case, and not just the closures. The district court was able to examine the lock track mechanism. Obviously, it's connected to a much larger machine, but where the closures are actually applied and the pressures that are put on those closures is actually applied from the lock track. And he had one right up there in front of him during the whole – well, virtually the whole trial. And nearly – notwithstanding that, nearly all of QuickLock's claimed errors address factual findings. QuickLock repeatedly argues in its briefs that the district court erred in giving weight to certain evidence rather than other evidence. With respect to expert evidence, right? Expert evidence largely, although if you look at the district court's opinion, he does not just rely upon expert evidence, but he also relies upon – I mean, the argument challenging the evidence. That's right. Yes, Your Honor. And I guess with respect to that, I guess there was only one – this case was about the performance of high-impact polystyrene plastic device in a large machine. That's really what it's about, and whether it's functional in this shape. There was only one independent expert that is an expert in plastics engineering, and that was put on by Schutte. It's Dr. Paul Cook. He is as knowledgeable, as the record shows, I would submit, as anyone in the country on this. He's both in his formal education, in his work experience, in his position as head of the plastics department at Penn State. He made these determinations, and they were credited by the judge. Now, of course, experts are always sort of walking, or in this case, sitting dartboards, and you can always quibble with what they say. But Quick Lock didn't even put on an expert on this topic. The person that they want this court to disregard or to overturn the district court's crediting of Dr. Cook's testimony is in favor of their employee, Mr. Hart, who has been their employee for a long time. As a matter of fact, he's only been an employee. He's never worked anywhere else other than Quick Lock. Unlike Dr. Cook, he actually has no college degree in plastics engineering or graduate degree. He actually didn't go to college. Now, it was within the district court's discretion and right to credit Mr. Hart over Dr. Cook, but vice versa is also in the district court's discretion to credit Dr. Cook. And certainly we would submit as not error for them to do so in crediting his testimony along with the judge's own common sense and the other evidence that came through in finding that this shape is functional. And with respect to the issue of the weight to be given . . . This is a question here in my mind about these other examples. They all seem to be able to fit into the machine, correct? And so there isn't much difference between the shape, but I'm not sure that if you had come up with one of these other shapes down here, the bottom two, either of those, that they wouldn't still be complaining about that. I mean, you know, it would be a variation in terms of the way the closure looks to some degree, but they're essentially rectangular and they essentially have a hole in them. And they're used in the same way. They have the opening at the top. And it's not like . . . I mean, I don't think a customer would necessarily be less or more that it would affect the customer's view of who the source is, regardless of which one was used. We agree, Your Honor. I mean, I can't speculate as to whether Quick Lock would have objected to these. Obviously, now they say they would not. However, and of course, in terms of the differences, let's not forget the differences are magnified, as with the picture, so everyone can see it. When they are an inch large, the differences are much smaller. But I will say this. As you said, the most important thing to my client or to a bakery or to whomever is selling these closures is to get them on the bag. There's no one who buys bread or buys these closures because they're lovely or anything other than they want to make sure that they can do just what the Quick Lock closure does, get it on 6,000 bags per hour. If it stops, there's a whole buildup of bread and it's a big problem. That's all they care about. So if one of these, as you can see, my client's design is not identical. There's a little notch out of the bottom. I know it's not so easy to see, but there is. And there was testimony in the trial. I'm not sure if it's in the appendix, but it's certainly in the record, from the designer of this closure that they wanted it to be as far away from the Quick Lock closure and still work. There was nothing magic about it. What was the testing that was done on the bottom two that indicated that they could also work? It was done by Quick Lock, and they had a strip of each closure made out of 3D plastic printed. So it was a different kind of plastic. And, well, the final test they did, they ran a strip through automatically, and it went onto the bags, three consecutive bags. And we submit that that's not an adequate testing. As a matter of fact, I think it's not quite undisputed, but it's pretty close to undisputed, because Quick Lock's evidence was that they would do at least a roll before they would introduce, and a roll is 3,000 closures, before they would introduce something into the market. And, as a matter of fact, even in, I don't remember if it was the opening brief or the reply brief, Quick Lock itself said that the testing showed that there could be further testing to see whether it was marketable. Not that it showed that it was marketable, but whether it could be for further marketing. When it runs through the machine, how many of these go through at a given period of time, Quick Lock's product? Well, they're on a reel. Don't I have the number 6,600 in mind for something? That's the number per hour. Per hour, okay. That's not the number of closures. No, that's what I was looking for. On a reel, it's several thousand. If that's the closures per hour, that kind of a test wasn't done on these bottom ones. No, it was not. And, as a matter of fact, the testimony from our client was that before they introduced the CLPS model, they tested on 100,000. Because, again, you're introducing yourself to customers, and if it doesn't go well, if you just have one, they'll just switch back. They don't want the most important thing to these bakeries is that they go through smoothly. Let me pose you. This is a real-life example for me. I'm on occasion a carpenter, and I use a swingline stapler, and when I buy it or I go get swingline staples, but occasionally I can't find swingline staples. So I go and find craftsman staples, which say they fit the model of stapler that I have to put on siding or whatever it is. What's the difference between an argument about craftsman staples, which may not work quite as well in a swingline stapler and swingline staples? Aren't we talking pretty much about the same thing here? That's the exact example that I like to use when we discuss it, not to disclose privilege or work product, but when we discuss it around the office. Be careful. You may be waving. No, no, I know. Well, at this juncture, it could be worse. But that was the exact example I used. I mean, let's say swingline invented staples and stapling, and I have no reason to believe they did, but let's say they did and they had a patent on it, and when everyone would go to the store,  and they would say, give me a swingline and all that, so people would associate with swingline, and somehow swingline was able to get a trade dress registration. And then after that expired, let's say the patent was on the stapler, I should say, not on the staples. They got a trademark registration for the staples. And after that expired, how is someone else going to sell products that work on the stapler? I mean, with a staple, it's not such a big deal because, well, you can buy another brand of stapler. It's not as big a deal, which you don't want to. It's, you know, money. But with an 872 machine, you either have to get a new machine or, as they've said, you have to get a new lock track. Well, that's, of course, a purely functional item. I mean, there's no question about it. You know, staples don't come with, you know, bells and whistles on them, as between them, I mean, in any way. It's just a one piece of wire that fits a stapler. And I think your adversary would say that that's probably not an apt example in that sense because this is capable of some variations. Whether he proved it or not is another question. And still working in the machine. Yes, well, staples do come in different sizes, but that is true. You have to fit the stapler. You have a stapler, and you're buying staples. You buy the swing lines, and then you maybe, if the store happens to be out, they say, well, we've got, you know, Jones staples here. They'll work for your machine. You buy those. That is true. You're talking purely in the world of functionality there. I would say it is less elaborate. But, I mean, we're looking at all the designs on the bottom there. That's not very elaborate either, this basically square-shaped closure. I mean, it's not very similar to other examples of protectable trade dress, like the example used in, forgive me, it was in Qualtex or Traffix by Judge Scalia, Justice Scalia, excuse me, of a penguin-shaped liquor tumbler, alcohol tumbler. I mean, that has bells and whistles. This one, as a matter of fact, there's the testimony that these machines were designed to work with these closures. I mean, they had the closures, and they wanted the machine to work with them, and that's what the function was. They're designed by engineers, not by industrial designers like the expert brought forward by QuickLock. This is an engineered product designed to perform a certain function. Because it's got to fit through a track in a particular dimension and come out and essentially be able to be inserted at the same point that every other thing that goes through there that works is going to fit, right? That's right. And there may be other, I don't want to say I'm certainly no plastics engineer, and there may be other shapes that could work in a lock track and in the current dimensions, but that's not the test. The test isn't whether this is the only one. The test is whether this shape has the, you know, contributes to the function, and by having smooth sides, it does make it more predictable, or as smooth as is necessary. By having as much plastic within it, it makes it stronger. Okay. So that's... Anything else, and then we're going to give Mr. McQuillan some time to talk here. Well, just one thing, I suppose. With respect to the weight issue of the PTO, I mean, we believe it's mostly in our brief, but I just wanted to address very briefly the standard overview for what it's worth. I think it's sort of a hybrid one. I mean, whether the presumption should be applied, and we believe it was. It's on page 19 of the opinion that the presumption was applied to this registration. That would be a de novo standard. However, how much weight to give reasoning or lack of reasoning in any opinion, that's, we believe, a matter of fact, how much weight to give any other evidence and should be clear error. Thank you very much. Thank you, Your Honors. May it please the Court? I'd like to address a few things that came up in the rebuttal there. First, as to the Staples analogy. Do you agree with Judge Walker? I don't disagree. The point I would like to make is that, while you look at the shape of the closures provided in the registration, you think that's a fairly simple shape and, you know, kind of like a Staples, a simple shape. But the reality is, QuickLock has been making this closure since the 50s. There's been very few other competitors in plastic closures with QuickLock. That this shape with the beveled corners and the substantially square shape and flat perimeter, flat size of it, is well known to be associated with QuickLock. When you see this closure, those bakeries, those produce makers, oh, that's QuickLock. You look at a Staple, you'd be hard pressed to say, oh, I can tell who made the Staple. So I don't think it's a fair analogy at all. The speed at which these run through the machine, the maximum speed is about 6,600 per hour. The typical speed is more like 3,600, 60 per minute. The testing that was done was at that speed. And it was done both by QuickLock and by Schutte's engineer. Schutte's engineer, in fact, used the same material that is used with the commercially available closures. And those, according to him, appeared to work. So the question became is whether, and we believe the district court was wrong in concluding that the level of proof to show that there were viable alternative designs required to show that these could immediately enter the market and people could buy them today and you had to make them at that level and prove that. We believe, and Mr. Hart, who was discussed at some detail in comparison to Dr. Cook, Mr. Hart is the director of engineering at QuickLock and has been with the company for over 30 years. He works with these machines every day. He's running different closures through the machines. The machines, all you need to do is swipe out a lock track. It's an item that costs $100 or so. It takes 15 to 30 minutes to swap it out, and you can run different closures through it, ones that are much higher, different shapes, widths, heights, extreme rectangular shapes that would not be covered by the 043 registration. So the point is it's not just these alternative designs. These would work in the same lock track. You wouldn't have to do anything but put in a new closure, but with a simple swap out of the lock track, you can put in a variety. The possibilities are practically endless in the sizes of the closures you can put through the machine. The other thing about Dr. Cook, who was their expert who specializes in plastics material, he did the bare minimum in analyzing these closures and speculated at length about the problems these closures could have, but the fact is he never even inspected a machine prior to disclosing his opinions. He did not measure the forces applied to the closures. Nonetheless, he speculated that, well, they could break or they could do this, but the material used, high-impact polystyrene, is very durable. It is very strong. The holes in the middle come in a variety of sizes. There are very large holes in the middle when you have a thick bag, and they don't break. This is not a realistic concern, but he speculated it could be a concern. Let's see. The last point I would leave you with is to come back to traffics, and the traffics does address the point I would make about it is this. The district court found that the decision from the patent office was entitled to little weight because it was before traffics, that somehow traffics changed the law on functionality. Fundamentally, it did not. What traffics did do was find that where there are patents, that there's an expired patent that disclosed the feature in the trade dress and it's claimed or described in a functional way, and we maintain and it's explained in our briefing that the quick-light patents do not disclose these specific features. Now, in that case, that's the end of the inquiry. In traffics devices, if that patent claims the trade dress feature, you can end the inquiry there and determine it's functional. You don't need to go forward and look at alternative designs and so forth. With that said, it's still appropriate if those patents do not describe or claim the trade dress feature in functional ways. It is appropriate to look at alternative designs and courts do it all the time. But you're saying here they should not have? I'm saying that where the court made a mistake was finding that traffic somehow changed the analysis in a way that it could discount the registration of the trade dress. And lastly, in terms of the patents, there were three patents cited by the district court. And these patents, as an example, one of the patents, the claims are directed to a bag-confining mouth. And as you know, Quick Lock maintains that the triangular shape opening to the closure that you can see here on the JNRP is part of the trade dress. Now, the claim does discuss having a bag-closing mouth, but that can be accomplished in a variety of ways. It doesn't require a V-shaped inlet at a 90-degree angle. And where there are a multitude of ways to perform that function, we don't think it's appropriate to read that claim language to find that, therefore, the V inlet is necessarily functional. But isn't it the most? I mean, I'm just thinking about this from a practical perspective, totally lay. I mean, isn't that the one that makes the most sense? I mean, if I'm suddenly trying to stick something on a constricted rope, baler twine, whatever you want, having something with a V in it that's got the slot opening at the end and will grab it on the other side. Well, in fact, I mean, the bags are pulled tight, so they're a thin line when they feed into it.  And the two sides of the closure are canned. But you want something that grabs what it's going to come around in the first instance, which, you know, you can do it with a flat side. Well, where do you hit it? Where do you hit the thing that you're trying to grab around? Sorry, where does the clip hit? Hit the bag. Right. The bag's going to hit the bottom of the hole. No, I understand that, but it's guided in by the V. Isn't that the most functional way to design anything like this? It needs an inlet to allow it to come in, obviously. But, in fact, Mr. Hart explained that this is not the optimal inlet, that an optimal inlet would actually have curved surfaces leading in, that there is a slight possibility of stagging because you have short corners here and here on a V-shaped inlet. So it is not the most optimal solution. Who knew? Thank you, Your Honor. Thank you. Thank you both. Helpful arguments. We're going to reserve decision in this case. The remaining three cases on the calendar are on submission, so I will ask the clerk please to adjourn court. Court is adjourned.